UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-80088-CR-Smith/Matthewman

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

ANTONY JUNIOR HARRIS,

     Defendant.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS [DE 73]

THIS CAUSE is before the Court upon the Defendant [1] Antony Junior Harris' ("Defendant") Motion to Suppress Evidence Derived from Law Enforcement's Illegal Search and Seizure ("Motion") [DE 73]. The Motion was referred to the undersigned by the Honorable United States District Judge Rodney Smith. *See* DE 677. The Government has filed a Response [DE 90], and Defendant has filed a Reply [DE 93]. The Court held an evidentiary hearing on the matter on August 17, 2021, and heard argument from counsel. This matter is ripe for review.

### I.  BACKGROUND

On February 9, 2021, Defendant was charged by way of a Superseding Indictment with conspiracy to possess with intent to distribute 400 grams or more of a mixture and substance

---

[1] The Court notes that Defendant's name has been spelled "Antony" Junior Harris throughout this case. However, he testified at the suppression hearing that his name is "Anthony" Junior Harris. Furthermore, his name was spelled "Anthony" Junior Harris in case 13-cr-80247-BB.

containing a detectable amount of fentanyl, and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); and attempted possession with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount fentanyl, and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 9). *See* DE 41.

Trial is scheduled for the two-week trial calendar beginning September 27, 2021. [DE 89]. Defendant moved to "suppress and otherwise exclude from evidence at trial any and all items seized and observations made by law enforcement during the execution of a warrantless search of a package seized from a Federal Express facility, along with all derivative evidence gathered as a result of the items seized." [DE 73 at 12]. This would include approximately 1,714 grams of crystal methamphetamine and 2,033.5 grams of fentanyl, as well as other physical evidence and the contraband found in his residence.

## II.  THE PARTIES' CONTENTIONS

### A.  Defendant's Motion to Suppress [DE 73]

Defendant first argues that law enforcement violated Defendant's Fourth Amendment rights when Sergeant Anthony Combs "made known to FedEx staff his preliminary findings, including, but not limited to the reasons for his suspicion of the package, as well as the results of the canine free-air sniff, and sharing his corresponding interpretation of his dog's trained response with individuals who were private citizens with no similar training." [DE 73 at 6]. According to Defendant, Sergeant Combs had the express purpose of "enlisting the assistance of FedEx employees and/or management, knowing that the carrier's airbills routinely carried a notice to

users that such packages could be opened and inspected either before or after it was accepted for shipment." *Id.* Defendant contends that, instead, Sergeant Combs should have sought a search warrant from the Court. *Id.* In sum, Defendant argues that Sergeant Combs "chose to enlist a private actor to effectuate his purpose and exercise of state power by circumventing the procedure in seeking a search warrant. This action assisted law enforcement rather than furthering the FedEx employee's or their employer's own ends." *Id.* He cites case law regarding the improper use of a private citizen as an instrument or agent of the Government. *Id.* at 6-7.

Next, Defendant maintains that he had a constitutionally protected expectation of privacy in the package being handled by a common carrier. [DE 73 at 7]. He contends that, "[a]lthough the package was not addressed to Defendant, it was sent in the name of and to the address belonging to an agent of [D]efendant. Courts have said that individuals may assert a reasonable expectation of privacy in packages address to them under fictitious names." *Id.* at 8. Defendant also argues that "[l]aw enforcement's conduct clearly interfered with the expectation of privacy in having the package delivered pursuant to the terms of delivery under which FedEx was contracted." *Id.*

Defendant additionally argues that "[l]aw enforcement's admitted 'seizure' of the package, prior to the opening by FedEx officials was strictly the action of law enforcement without any articulable suspicion to justify the warrantless seizure." [DE 73 at 8].

### B.      The Government's Response [DE 90]

In response, the Government first argues that Defendant lacks standing to challenge the search because he failed to establish that he had a reasonable expectation of privacy in the parcel. [DE 90 at 1]. The Government points out that Defendant "was neither the sender nor addressee of the parcel. Nothing on the parcel – the sender's name, the sender's address, the listed recipient, the

recipient's address, nor the phone number listed on the package – connected it to Harris." *Id.* at 7. The Government also argues that "[i]n his motion, Harris does not actually allege that the addressee 'C. Bucklin' was his fictitious name; instead, he states that the addressee was his 'agent.'" *Id.* at 7-8. The Government further contends that Defendant has no standing because "[t]here is no evidence to suggest that Harris lived with Ms. Bucklin, nor that Harris had any privacy interest in this residence. He did not. In fact, immediately after Harris picked up the package from Bucklin, he (Harris) drove back to his own residence where the events leading to his arrest unfolded." *Id.* at 8.

Next, the Government argues that, even if Defendant had standing, "the opening of the parcel did not constitute a search under the Fourth Amendment because it was conducted by a FedEx manager in conformity with FedEx's internal policies." [DE 90 at 9]. The Government also asserts that the law is clear that "[a] search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government" and that the Court must consider certain factors in determining whether the FedEx manager acted as a government agent. *Id.* at 9-10. The Government concludes that "[t]he FedEx manager opened the package, not to assist law enforcement, but because FedEx does not want its facilities used to distribute illegal narcotics. The FedEx manager's search does not implicate the Fourth Amendment." *Id.* at 10.

## C.    Defendant's Reply [DE 93]

In reply, Defendant asserts that he is prepared to testify at the suppression hearing as to a series of facts that will establish that "C. Bucklin" is a fictitious name that is sufficiently connected to him, that he has a privacy interest in the apartment to which the package was delivered, and that he has standing to bring the motion to suppress. [DE 93 at 1-3]. Defendant next argues that there

4

is a discrepancy regarding the time that the FedEx package was delivered, which "is further indicia that FedEx is operating as an agent of the Government by falsifying their records to confuse the recipient. There can be no other logical explanation." *Id.* at 2. According to Defendant, "after law enforcement developed probable cause and seized the parcel, law enforcement allowed FedEx to then open the package. In this matter FedEx is the definition of an agent or instrument of law enforcement. Law enforcement doesn't seize suspected narcotics then allow non law enforcement agents to search a parcel. The proper procedure is to obtain a search warrant." *Id.* at 3-4.

## III.   SUPPRESSION HEARING TESTIMONY AND EXHIBITS

### A.   Exhibits

The Government introduced three exhibits during the evidentiary hearing. [DE 97]. Exhibit 1 is a photograph of the package label for the package at issue that contained narcotics. Exhibit 2 is the lease under the name of Jose Lopez and Natalie Tortelli dated June 28, 2019 to July 27, 2020, for the residence at 101 S. Federal Highway, Apt. 517, Boynton Beach, Florida. Exhibit 3 is the transaction activity report for packages sent by "Luis Sanchez" from the Mailbox Plus location in Signal Hill, California, between January and August 2020.

Defendant introduced five exhibits. Exhibit 1 is a photograph of a plane ticket discovered by law enforcement at 101 S. Federal Highway, Apt. 517, Boynton Beach, Florida, in the name of Alexis Bucklin, from when she flew from Dayton, Ohio, to Chicago, Illinois, on July 26, 2020. Exhibit 2 is the criminal complaint and affidavit filed in this case. Exhibit 3 is the state court affidavit and application for search warrant dated July 28, 2020, for the residence at 421 N. 5th Street, Apt. 1, Lantana, Florida. Exhibit 4 is the federal application for search warrant dated August 27, 2020, for the residence at 101 S. Federal Highway, Apt. 517, Boynton Beach, Florida. Exhibit

5 is a CD Rom and a flash drive containing recordings of the four phone calls Defendant made to FedEx claiming to be an individual named Fredrick Bucklin and inquiring about the status of the package.

### B.     Testimony[2]

The Government called three witnesses: DEA Task Force Officer Rey Paniagua, FedEx manager Cosimo DiMarco, and Palm Beach Sheriff's Office ("PBSO") Sergeant Anthony Combs. Defendant testified on his own behalf. The relevant testimony of the witnesses is summarized below.

### *Task Force Officer Rey Paniagua*

Officer Paniagua testified as follows. He is a member of PBSO's narcotics unit and a task force officer with the Drug Enforcement Administration. He has been a task force officer for approximately 18 years and is the case agent on Defendant's case.

On July 28, 2020, law enforcement came across a parcel at a FedEx facility that contained approximately two kilograms of crystal methamphetamine and approximately two kilograms of fentanyl. Sergeant Combs was working his K9 that day and came across a suspicious package. The K9 alerted, and then the FedEx manager opened the package. Afterwards, law enforcement applied for a search warrant for a drone and also an anticipatory search warrant to conduct a controlled delivery.

The parcel was sent from a Mailbox Plus in California, and the recipient was C. Bucklin at 421 N. 5th St., Apt. 1, Lantana, Florida. No information on the label objectively tied the package

---

[2] The testimony has not been formally transcribed and made part of the record. The narrative contained herein is a summary of testimony as recalled by the Undersigned.

to Defendant. Additionally, the phone number listed on the package does not belong to Defendant. Agents ran the address on the parcel and came up with the name of Alexis Bucklin, who was renting the Lantana apartment. The Lantana apartment had no connection to Defendant in any law enforcement databases.

Prior to executing the anticipatory search warrant at Ms. Bucklin's apartment, officers began conducting surveillance a little after 2 p.m. The package was delivered a little after 3 p.m. Agents watched the package sit outside of the office area of the apartment building for about an hour and a half. Then, at approximately 5 p.m., agents observed an unknown white female pick up the package and walk toward the area of apartment 1. The package no longer contained narcotics, but rather the sham narcotics which had been inserted by law enforcement.

Approximately 20 minutes after the female retrieved the package, a black Mercedes pulled up. Agents ran the tag, and it came back to Defendant. An address other than the Lantana address was associated with the tag. Agents observed Defendant walk over to the area of apartment 1 and remain there for approximately 11 minutes. Then he was seen coming from the area of apartment 1 carrying the package. Defendant placed the package in his vehicle and left the area.

Officers followed Defendant to 101 S. Federal Highway, apartment 517, Boynton Beach, Florida, an apartment in a luxury building. Officers went to the leasing office with a photograph of Defendant. The manager said he recognized the person in the photograph as someone named Jose Lopez who lived in apartment 517. Agents next went to apartment 517 to try to conduct a knock and talk. No one answered the door. To preserve evidence, agents had the manager unlock the door. Agents did a clearing of the residence, and no one was there. Simultaneously, another task force officer saw Defendant exiting the apartment. When she tried to make contact with

Defendant, he took off running eastbound towards the water. Defendant led officers on a foot chase for about ¼ to ½ mile. At the time of his apprehension following the foot chase, Defendant had approximately $11,000 in cash and a set of keys on his person. One key opened the door to apartment 517, and one was the key to the black Mercedes.

After apartment 517 was secured, agents applied for and secured a search warrant. They found the package, the ripped label from the package, the box of fake narcotics, marijuana, drug paraphernalia, and a ledger with balances owed and names and/or aliases. The tracking beacon from the package was located later on the first floor; it appears that Defendant tossed it out the window from the fifth-floor apartment.

Officers also applied for and secured a search warrant for Ms. Bucklin's apartment. They found no items related to Defendant in Ms. Bucklin's apartment, and nothing indicated that Defendant was living there. Rather, Defendant's clothes, shoes, jewelry, and other belongings were found in apartment 517.

Agents later went back to the leasing office at 101 S. Federal Highway and obtained the lease for apartment 517. It was in the names of Jose Lopez and Natalie Tortelli and was signed by both of them. Jose Lopez is Defendant's alias.

Law enforcement provided an agent in California with photographs of Defendant and Ms. Bucklin. The California agent spoke with an employee at the relevant Mailbox Plus. The employee could not recognize either of them but informed the agent that the person who paid for the shipment of the target package was named Luiz Sanchez. In fact, on the torn package label, Luis Sanchez is mentioned under the zip code. Luis Sanchez sent a total of 18 packages from that Mailbox Plus location and paid in cash each time. He always brought the packages to the Mailbox Plus location

right before FedEx's daily pick up, and the packages were always sent priority with overnight delivery.

The California agent received records from Mailbox Plus for packages sent by Luis Sanchez between January and July 2020. Records show that, on July 29, 2020, February 11, 2020, and May 13, 2020, Mr. Sanchez sent packages to "A. DiPace" in Boynton Beach, Florida. A woman named Stephanie DiPace was in a romantic relationship with Defendant at the time, and the apartment to which the packages were sent was where Stephanie DiPace lived. On March 25, 2020, Mr. Sanchez sent a package to "C. Rainey" at hotel in Palm Beach. At the time, Defendant was in a romantic relationship with a woman named Priscilla Rainey. On April 13, 2020, Mr. Sanchez sent a package to "C. Rainey," but at a different address—135 SE 6th Avenue, Apt. 228, Delray Beach, Florida. On June 4, 2020, and May 1, 2020, Mr. Sanchez sent two packages to two different individuals at that same Delray Beach apartment. On June 23, 2021, Mr. Sanchez sent a package to "A. Buclin" at an apartment in Boca Raton, Florida, which was not Alexis Bucklin's real residence. On July 6, 2020, and July 9, 2020, Mr. Sanchez sent packages to "C. Bucklin" at 202 SE 5th Avenue, Delray Beach, Florida. Finally, on July 27, 2020, Mr. Sanchez shipped the target package to "C. Bucklin" at 421 N. 5th Street, Apt. 1, Lantana, Florida.

Officer Paniagua spoke with Ms. Bucklin's landlord and was told the landlord was in the process of evicting her because she had not been paying her rent. She had an overdue balance of $5,200.

The FedEx tracking link shows that the target package was delivered at 10:29 a.m. on July 28, 2020; however, this is not accurate as the package was not actually delivered until around 3 p.m. that day. Defendant called FedEx four times on July 28, 2020 to inquire about the status of

delivery of the package. He knew the entire tracking number. While on the phone with FedEx, he used the name Fredrick Bucklin. However, agents ran Defendant in various law enforcement databases. There is no record of Defendant using the aliases of C. Bucklin or Fredrick Bucklin.

The Court found the entirety of Officer Paniagua's testimony to be very credible.

### *Cosimo DiMarco*

The Government called as its second witness Cosimo DiMarco, a manager at the FedEx facility located at Palm Beach International Airport ("PBIA") in West Palm Beach. Mr. DiMarco is in his twenty-second year working at FedEx. Mr. DiMarco's general duties include delivery of heavyweight freight, supervising, customer service, auditing, and other related tasks.

The FedEx service guide states that FedEx has the right to open packages and search their contents as FedEx has custodial control over all packages. There is no formal contract signed by the customers, but this policy is in the approximately 175-page shipping agreement. FedEx also has a policy of prohibiting the shipment of contraband. If a FedEx employee discovers a shipment of narcotics, that employee is supposed to notify security personnel and obtain instructions about what to do with the shipment. FedEx is not in the business of shipping illegal contraband, such as narcotics, cash, and dangerous items. If contraband is located in packages, this puts couriers at risk. There have been at least two incidents in the past involving contraband and couriers' safety. FedEx's searches have nothing to do with law enforcement.

On July 28, 2020, Mr. DiMarco was working as a manager at the airport FedEx facility. PBSO personnel were present that day. PBSO personnel were present at the facility about 95% of the time back then; they come less frequently since the onset of the pandemic. They have K9's with them and are searching for contraband. FedEx does not have any agreement with PBSO. Any

10

law enforcement officer who has a Security Identification Display Area (SIDA) badge issued through PBIA can enter the FedEx facility. When PBSO personnel are at the airport, they are not employed by FedEx and do not work at FedEx's direction.

On July 28, 2020, Mr. DiMarco saw a PBSO officer's K9 alert on a package. The officer was bringing the package back toward the belting system, but Mr. DiMarco stopped him from putting the package back into the system, took the package, and opened it. When Mr. DiMarco took the package from the officer, he told the officer that the dog had alerted on the package and asked the officer not to put the package back on the belting system. The officer did not respond or even agree that the K9 had alerted on the package. Mr. DiMarco opened the package right there. The PBSO officer did not tell Mr. DiMarco to open the package, did not assist Mr. DiMarco in opening the package, and did not encourage Mr. DiMarco to open the package. Law enforcement does not direct FedEx employees. Mr. DiMarco opened the package on his own without any direction or encouragement from Sergeant Combs.

When Mr. DiMarco opened the package, it appeared to contain drugs. The PBSO officer observed the drugs and at that point seized the package. The officer also filled out a seizure form per FedEx policy to receive custodial control of the package from FedEx. FedEx lost custodial control at that point.

Customers cannot collect packages at the PBIA FedEx facility as it is not a pickup or delivery location. In general, however, if an individual wants to pick up a package at a FedEx facility open to the public, he or she must show a state ID, and that ID must be an exact match to the address and name printed on the package itself. Therefore, if a package is addressed to C. Bucklin, an ID in the name of Antony Harris would not be sufficient. The package also would not

be released solely because Defendant is in a relationship with Alexis Bucklin. Simply having a tracking number is not enough either.

It is not regular FedEx practice to open packages. However, Mr. DiMarco has opened packages a few dozen times in his 22 years at FedEx. He could not recall precisely how many packages he has opened, but it has occurred on various occasions during his employment.

Mr. DiMarco opened the target package at around 7 a.m. On cross-examination, he explained that he believes the FedEx tracking information for the package shows that it was delivered at 10:29 a.m. because the package was shipped on a priority basis and had to have a disposition on it in the system by 10:30 a.m. He believes the entry was made to protect the service for that particular package and that one of Mr. DiMarco's two agents put the entry into the system. It was not done at the request of law enforcement.

The PBIA FedEx facility handles 1200 to 1300 packages in any given day. Mr. DiMarco became suspicious of the target package when he saw the K9 alert. He could not have known that the package contained narcotics if the K9 had not been there. Mr. DiMarco has observed PBSO personnel often and has asked a lot of questions in the past. PBSO officers have told him in casual conversation about K9 reactions, and thus he understands K9s' reactions when they find something of interest. He also has K9 knowledge as a result of working at a FedEx facility in New York after 9/11. While he is not trained in K9 reactions, Mr. DiMarco knows based on previous experience that dogs sit and stare at a package when they smell narcotics. Mr. DiMarco has spoken to Sergeant Combs, who was regularly at the FedEx facility during the relevant time period, about Sergeant Combs' K9, but Sergeant Combs never said what to look for if the K9 alerted. Mr. DiMarco has never once had any kind of agreement with Sergeant Combs about what happens if a dog alerts on

a package. Mr. DiMarco cannot recall a time that a K9 alerted, and he failed to open the package.

Mr. DiMarco's job is not to watch Sergeant Combs and the K9; however, if the K9 is working, and Mr. DiMarco happens to see what is going on, he gets involved. His job is to be near the belt 99% of the time, especially when aircraft land.

The Court found Mr. DiMarco's testimony to be very credible. Moreover, Defendant in no way impeached Mr. DiMarco and presented no evidence that impeached Mr. DiMarco's testimony.

*PBSO Sergeant Anthony Combs*

The Government called as its third witness[3] PBSO Sergeant Anthony Combs, who has worked for PBSO for 20 plus years. He has been a sergeant assigned to the narcotics division since 2012. Sergeant Combs completed a 480-hour course and is certified through the State of Florida to handle a narcotics-sniffing K9. Kaya is the certified K9 assigned to him. Sergeant Combs has been involved in hundreds of narcotics investigations.

On July 28, 2020, Sergeant Combs was working at the PBIA FedEx facility. His duty was to interdict any parcels that may contain narcotics. He worked the line as the parcels went from the plane to the belt. The airport itself authorized him to be there by providing him with a SIDA badge. He is permitted to go almost anywhere at the airport, including the FedEx facility, with his SIDA badge. Sergeant Combs is not employed by FedEx and does not work at its direction. He generally looks for suspicious parcels, removes them, and has Kaya sniff the suspicious parcels along with other like parcels. Sergeant Combs then looks for a final response by Kaya.

On July 28, 2020, Sergeant Combs removed a parcel of interest, placed it among other like

---

[3] Defense counsel actually requested that the Government call this witness after the Government had initially rested, and the Government, with court permission, complied.

parcels, and released Kaya. Something about the target package sparked Sergeant Combs' interest. He believes it was that California was the source state and possibly something about the taping on the package. Kaya had a final response on that parcel. Sergeant Combs was walking back toward the belt area when he was approached by Mr. DiMarco. He had to walk that direction to reach to a desk to set the package down and secure his K9. Sergeant Combs had not yet decided whether to seize the package when Mr. DiMarco came over to him. Mr. DiMarco told Sergeant Combs that he had seen the dog alert and took the package from Sergeant Combs. Mr. DiMarco then opened the package. Normally, when Kaya reaches final response, Sergeant Combs seizes the package. In this case, FedEx made its own decision as Mr. DiMarco seized the package.

Sergeant Combs never told Mr. DiMarco to open the package, never assisted Mr. DiMarco in physically opening the package, and did not encourage him in any way. Contrary to the language in the affidavits in this case, Sergeant Combs never told Mr. DiMarco that he was seizing the package prior to Mr. DiMarco opening it. Additionally, Sergeant Combs could not stop Mr. DiMarco from taking the package because Sergeant Combs was inside the FedEx facility. The package belonged to FedEx until it was signed for or delivered or until the point of seizure. Once Mr. DiMarco opened the box, Sergeant Combs saw that it appeared to contain four kilograms of illegal narcotics. Sergeant Combs called the head of the interdiction unit, who sent an agent to retrieve the package. He believes he also had probable cause to get a warrant if he had so desired.

Sergeant Combs has known Mr. DiMarco for a couple of years, and Mr. DiMarco may have asked questions in the past about how Kaya comes to a final response. Mr. DiMarco had also witnessed a final response by Kaya previously. Sergeant Combs has no agreement with FedEx or Mr. DiMarco. FedEx has, in the past, opened packages independently. Additionally, Mr. DiMarco

has opened other packages after the K9 came to a final response.

Sergeant Combs never asked FedEx to change the system to show that the package had been delivered at 10:29 a.m. Moreover, Sergeant Combs has never talked to Mr. DiMarco about changing records.

The Court found Sergeant Combs' testimony to be credible. Moreover, Defendant in no way impeached Sergeant Combs. Sergeant Combs' testimony was also consistent with Mr. DiMarco's testimony as to what occurred on July 28, 2020. Although the affidavit to the criminal complaint stated "[d]ue to the positive alert, FedEx Management was made aware that Sgt. Combs was seizing the parcel" [DE 1 at ¶ 7], Sergeant Combs did not write that affidavit, and he clearly testified that Mr. DiMarco took the package from him before Sergeant Combs seized the package.

### *Defendant Antony Harris[4]*

The defense called Defendant as its sole witness. Defendant testified on direct examination as follows. Defendant broke up with Natalie Tortelli because she was angry that he was talking to various females. Defendant had to move out of the apartment located at 101 S. Federal Highway. The apartment was in Ms. Tortelli's name, and she did all of the leg work with the leasing agreement. Defendant still had a key to the apartment, however.

Defendant met Alexis Bucklin at his sister's birthday party in May 2020. Ms. Bucklin told

---

[4] Prior to Defendant testifying at the suppression hearing, the Court cited to *U.S. v. Beltran-Gutierrez*, 19 F.3d 1287 (9th Cir. 1994), and *U.S. v. Quesada-Rosadal*, 685 F.2d 1281 (11th Cir. 1982), and explained to Defendant that a defendant's suppression hearing testimony can be used to impeach that defendant at trial. The Court also explained that the Government could attempt to impeach Defendant at the suppression hearing by using statements that he had provided at his prior proffers and debriefings with the Government. Defense counsel represented that he had had this conversation with Defendant multiple times before and had explicitly told Defendant that he could be impeached at trial with his suppression testimony and that he could be impeached at the suppression hearing with statements from his past proffers and debriefings. The Court conducted a colloquy with Defendant who advised the Court that he fully understood and nonetheless wanted to testify at the suppression hearing.

Defendant that she was behind on rent and needed help. She had a daughter, and Defendant felt bad for her. Defendant and Ms. Bucklin went to Los Angeles together a few times. Ms. Bucklin lived at 421 N. 5th Street, Apt. 1, Lantana, Florida. During the two-and-a-half-month period during which Defendant and Ms. Bucklin dated, Defendant was at her apartment pretty much every day. He stayed overnight between 10 and 20 times. He also brought clothes to Ms. Bucklin's apartment but put them in his car when he left or took them to the dry cleaner's. Ms. Bucklin gave Defendant a key to the apartment and told him he could come and go as he pleased since he put money in her bank account to help her pay rent. Defendant believes he provided Ms. Bucklin with approximately $2,000.

When Defendant was apprehended by law enforcement, he had keys to Ms. Tortelli's apartment and Ms. Bucklin's apartment with him. He used Ms. Bucklin's key to get in and out of her apartment. On July 28, 2020, he used that key to pick up the target package in apartment 1.

Defendant and Ms. Bucklin flew to California, and Defendant purchased marijuana there on July 27, 2020. Defendant paid an individual to ship the marijuana, told him to ship it to Ms. Bucklin's apartment, and told him to put "C. Bucklin" on the label as the recipient. Defendant also told the sender to put two phone numbers for the recipient (one with area code 561 and one with area code 310) on the label. Both phone numbers belonged to Defendant, but he threw those phones into either a lake or the ocean when agents chased him on July 28, 2020.

Defendant and Ms. Bucklin flew back to South Florida from California around midnight on July 27, 2020 and expected the package to arrive on July 28, 2020. Defendant was on the airplane when the package was mailed. He later received the tracking number from the sender. On July 28, 2020, Defendant and Ms. Bucklin drove from the airport to Ms. Bucklin's apartment.

They slept for a while and watched television. Then Defendant left the apartment and looked for suspicious activities related to delivery of the package. He began wondering where the package was. The FedEx tracking website said it was still in West Palm Beach. Defendant called FedEx after 10:30 a.m. when the package did not arrive. He had to provide the full tracking number. Defendant made a second call to FedEx from in front of Ms. Bucklin's apartment. Around noon Defendant went to the gym. He called FedEx both from the gym and on his way home from the gym to find out the status of the package delivery. On all four calls to FedEx, Defendant identified himself as Fredrick Bucklin. He never disguised his voice and provided his real phone number.

Around 4 p.m., the FedEx tracking information on the website was updated to say that the package had been delivered at 10:29 a.m. Ms. Bucklin went to retrieve the package, and then Defendant returned to her apartment. Defendant opened the package and took it. He was angry that Ms. Bucklin had not looked for the package while he was gone, and he left in a rage. Defendant went straight to Ms. Tortelli's apartment. He was staying at multiple residences during that period and was in several relationships. If Defendant had had to pick up the target package at a FedEx facility, he could have had an acquaintance make him a fake ID.

Defendant's testimony changed on cross-examination. On cross-examination, after admitting that he, along with his defense counsel, met with AUSA Rinku Tribuiani and DEA agents on three occasions to voluntarily provide proffers, he testified as follows.[5]

Defendant traveled with Ms. Bucklin and Ms. Bucklin's girlfriend to California prior to

---

[5] Defense counsel made a standing privilege objection during cross-examination, but the Court overruled the objection as the Government was impeaching Defendant. Moreover, Defendant and his counsel were warned prior to Defendant's testimony of the potential impeachment, and Defendant knowingly and voluntarily decided to testify with the advice of his counsel.

being arrested in this case. First, the three of them landed in Ohio to meet with Faubert Stvil, a co-defendant from Defendant's prior federal criminal case, because Stvil still owed Defendant some money. Then Defendant and the two females traveled from Ohio to Chicago to Los Angeles. After they landed in Los Angeles, they met with Horacio Beltran, the source of Defendant's drug supply. Beltran had previously sent Defendant packages containing crystal methamphetamine and fentanyl. On this occasion, Beltran was to mail one package of narcotics to Defendant and one to Stvil in Ohio. Defendant told agents that Stvil's package was supposed to contain crystal methamphetamine and fentanyl, and Defendant's package was supposed to contain marijuana. However, Stvil's package was incorrectly sent to Defendant.

After Defendant and Ms. Bucklin landed at Fort Lauderdale Airport, they went to Defendant's apartment at 101 S. Federal Highway and then went to Ms. Bucklin's apartment. Defendant left Ms. Bucklin's apartment and went to the gym. While at the gym, he received a text message that his package actually contained crystal methamphetamine and fentanyl; he knew the packages had been switched at that point. His plan was to send the package back to where it came from and have the packages exchanged. Defendant admits, however, that he has received several other packages containing crystal methamphetamine and fentanyl in the past.

Defendant also admitted on cross-examination that he met Ms. Bucklin at a party for strippers in late May 2020 or June 2020. Defendant previously told agents that Ms. Bucklin was looking for extra money and began helping him. Ms. Bucklin flew to Ohio in June 2020, right after she met Defendant, to transport $200,000 in drug proceeds for Defendant. After Ms. Bucklin made that trip, Defendant paid her $1,000. Defendant originally told agents that Ms. Bucklin used the $1,000 for cosmetic procedures, but he claimed at the suppression hearing that he was helping Ms.

Bucklin pay her rent. Ms. Bucklin later made a second trip for Defendant to transport drug proceeds. Defendant told agents that he gave her $2,000 after the trip, but he claimed at the suppression hearing that he gave Ms. Bucklin the money to help her pay her rent because he felt sorry for her and because they were in a relationship.

When the source in California asked Defendant where to send the target package, Defendant provided Ms. Bucklin's address. He had used the same address one other time with UPS. Defendant claimed at the suppression hearing that he had the package mailed to Ms. Bucklin because he was staying there and that he chose to give her $500 because she was behind on rent. However, Defendant previously told the agents that the $500 was in exchange for Ms. Bucklin agreeing to receive the package at her apartment.

The target package did not list Defendant as the sender or recipient. Defendant is not C. Bucklin, has no corporation called that, and has no ID with C. Bucklin on it. He has never set up any bank accounts, utilities, or bills using the name C. Bucklin. He only used the name C. Bucklin for purposes of mailing drug-filled packages. Defendant has used several fictitious names and IDs in the past because he distributes drugs. This includes the alias Jose Lopez.

Defendant has no credit cards, utilities, or bank accounts in the name Fredrick Bucklin. He only uses that name to mail drug-filled packages. He testified at the suppression hearing that he was going to put the name Fredrick Bucklin on a new lease and that he knew could obtain a fake ID with the name Fredrick Bucklin on it. However, he admitted that he is not actually Fredrick Bucklin and has no corporation in that name. Defendant later testified that he did actually have a fake ID with Fredrick Bucklin's name on it, but he threw it in the lake or water while being chased by law enforcement prior to his arrest. Defendant further testified for the first time on cross-

examination that the individual in California put "C. Bucklin" as the recipient of the package because he misheard Defendant when Defendant instructed the individual that the package should be addressed to "Fredrick Bucklin" and thought Defendant had directed to him to send the package to "Cedric Bucklin."

In July 2020, Defendant sometimes stayed at the apartment at 101 S. Federal Highway. His belongings, including high end clothing may have been found at that apartment, but he buys new clothing every day. Priscilla Rainey bought Defendant jewelry, which he kept at the 101 S. Federal Highway apartment. However, despite this, he left the apartment for the most part in February 2020 when Natalie Tortelli got into a fight with Priscilla Rainey. Defendant claims to have never signed the apartment lease as Jose Lopez.

The Court found Defendant's testimony to lack credibility. He was at times evasive. Moreover, he frequently provided contradictory and inconsistent testimony and also was impeached by the Government.

### *Rebuttal by Task Force Officer Rey Paniagua*

The Government called Officer Paniagua to rebut Defendant's testimony. Officer Paniagua was present at two of the debriefings with Defendant and his counsel. He wrote a report after the December 15, 2020 debriefing.

On December 15, 2020, Defendant stated that he met Ms. Bucklin for the first time in June 2020 during a stripper party. Defendant also detailed Ms. Bucklin's trips on his behalf and stated that he specifically paid Ms. Bucklin for the trips. He said that he paid Ms. Bucklin to use her address for the package that was seized. Defendant never stated that he was living with Ms. Bucklin or that he had a key to her apartment. He instead stated that he was staying at the apartment at 101

S. Federal Highway.

Additionally, Defendant's Mercedes was searched, and no clothing was found in it.

## IV.     DISCUSSION AND ANALYSIS

### A.   Whether Defendant has a Reasonable Expectation of Privacy in the Place Searched

"The defendant bears the burden of showing a reasonable expectation of privacy in the property searched." *U.S. v. Rose*, 3 F.4th 722, 727 (4th Cir. 2021) (citing *U.S. v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007)). "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *U.S. v. Jacobsen*, 466 U.S. 109, 114 (1984). "Both senders and recipients of letters and other sealed packages ordinarily have a legitimate expectation of privacy in those items even after they have been placed in the mail." *Rose*, 3 F.4th at 728 (citing *U.S. v. Van Leeuwen*, 397 U.S. 249, 251 (1970)). However, when a sealed package is addressed to a party other than the intended recipient, the recipient "does not have a legitimate expectation of privacy in the package absent other indicia of ownership, possession, or control existing at the time of the search." *Id.*; *see also U.S. v. Smith*, 39 F.3d 1143, 1145 (11th Cir. 1994) (district court did not err in concluding that a defendant who was neither the sender nor the addressee of a letter had no reasonable expectation of privacy in the letter.).

"The Supreme Court has enunciated a two-part test to determine whether an individual has a legitimate expectation of privacy in the object of a search: (1) the individual must manifest a subjective expectation of privacy in the object of the challenged search, and (2) society must be willing to recognize that expectation as legitimate." *Smith*, 39 F.3d at 1144 (citing *California v. Ciraolo,* 476 U.S. 207, 211 (1986); *U.S. v. McKennon,* 814 F.2d 1539, 1542–43 (11th Cir. 1987)).

"The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that the invasion occurred." *Jacobsen*, 466 U.S. at 115. Under certain circumstances, defendants may assert a reasonable expectation of privacy in packages addressed to them under fictitious names. *U.S. v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992); *U.S. v. Pierce*, 959 F.2d 1297, 1303 n. 11 (5th Cir.1992) (drawing a distinction between packages addressed to the "alter ego" of a defendant, and those addressed to individuals other than the defendant); *U.S. v. Richards*, 638 F.2d 765, 770 (5th Cir. 1981) ("The package was sealed and addressed to Mehling, which, in effect, was Richards."). Additionally, "even where a defendant does not own the property searched, he or she may nonetheless have a reasonable expectation of privacy in that place by virtue of his or her relationship with that place." *U.S. v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999).

The Government's position is that Defendant lacks standing to contest the search and seizure of the package as he did not have a reasonable expectation of privacy in the package. Defense counsel conceded at the start of the suppression hearing that the package did not list Defendant as a sender or recipient. Instead, defense counsel argued at the conclusion of the suppression hearing that the C. Bucklin name on the package is a fictitious name that has a sufficient connection to Defendant to confer standing. Defense counsel also argued that the package was supposed to be delivered to the apartment in Lantana where Defendant's girlfriend, Ms. Bucklin, lived and in which Defendant had a reasonable expectation of privacy. Defense counsel asserted that the following factors support Defendant's reasonable expectation of privacy in the apartment: he regularly stayed there, he paid some part of the rent from time to time, and he had a key. Defense counsel further contended that Defendant made repeated calls to FedEx because

22

it was, in fact, his package, that he had an ID with the fictitious name of Fredrick Bucklin but threw in in the lake or water, and that he used an alias first name with Ms. Bucklin's last name because then Ms. Bucklin could help him get package from the apartment building office.

The Government argued at the conclusion of the suppression hearing that Defendant must have a legitimate expectation of privacy which society recognizes, and that Defendant has failed to meet that burden. With regard to the fictitious name of C. Bucklin, the Government pointed out that Defendant had no bank accounts or driver's license in that name and only used that name to ship narcotics in the mail system. The Government further argued that Defendant had no reasonable expectation of privacy in the package because the very point of utilizing fictitious names and other addresses is to disassociate oneself from a parcel. Next, the Government asserted that the search occurred prior to delivery of the parcel at Ms. Bucklin's residence, and Defendant could not have exercised ownership rights or control over the package at the time of the search. The Government emphasized that none of the established facts would have given Defendant access to the package at the time of the search.

First, the Court rejects the defense's arguments that they have established a strong nexus or alter ego relationship between Defendant and his fictitious name. The package was addressed to "C. Bucklin." Defendant has provided no evidence whatsoever regarding his relationship with the name "C. Bucklin" other than to testify that the individual he paid to mail the package misheard Defendant when he asked that the package be mailed to "Fredrick Bucklin," and the individual instead heard "Cedric Bucklin." The Court finds this testimony lacks credibility and that Defendant made this representation on cross-examination as an afterthought. Additionally, the course of Luis Sanchez's and Defendant's past conduct shows that Defendant repeatedly asked Mr. Sanchez to

ship packages full of narcotics to various of Defendant's girlfriends, and, each time, used a girlfriend's accurate last name with a random letter before that last name which was in no way tied to the girlfriend's real first name.

Regardless, Defendant has also failed to establish a sufficient nexus between himself and the name "Fredrick Bucklin." Defendant did use the fictitious name Fredrick Bucklin when he called FedEx four times on July 28, 2020, but there is no evidence that he used the name for any other purpose. Defendant testified that he had an ID with the name Fredrick Bucklin on it but threw it in the lake or water and that he, at one time, planned to rent an apartment in the name Fredrick Bucklin. However, the Court finds this testimony lacks any credibility whatsoever. Not only is this testimony contradicted by other testimony provided by Defendant, but there is no physical evidence to support it. In fact, Defendant admitted at one point during cross-examination that he only used the name Fredrick Bucklin to ship drugs. Thus, Defendant has not established that Fredrick Bucklin was his alter ego or even a name he used for any purpose outside of shipping drugs.

Second, the Court rejects Defendant's argument that he has standing because he had a reasonable expectation of privacy in Ms. Bucklin's Lantana apartment, the address to which the package was shipped. The testimony at the suppression hearing conclusively established that Defendant kept no clothing, jewelry, documentation, or other belongings at Ms. Bucklin's apartment; rather, his belongings were found in apartment 517 in Boynton Beach where he did, in fact, reside under a false name. While Defendant did testify that he had a key to Ms. Bucklin's apartment, there is no other credible evidence supporting his claim he resided there, and, more importantly, simply having a key to an apartment does not equate to having a reasonable

expectation of privacy in that apartment. Defendant also testified that he helped pay Ms. Bucklin's rent, but this testimony was impeached as Defendant previously proffered to the Government that he simply paid Ms. Bucklin to help him with his drug operations. Moreover, Officer Paniagua testified that Ms. Bucklin owed back rent and was in the process of being evicted in July 2020.

Not only does the Court find that Defendant had no reasonable expectation of privacy in Ms. Bucklin's apartment, but it appears to the Court that the entire issue of whether Defendant had a reasonable expectation of privacy in that apartment is somewhat irrelevant in the Court's analysis. Law enforcement did not enter the Lantana apartment until they later secured a search warrant, and the package was not found in that apartment. The package was not seized from that apartment. Further, the package was opened and seized at the FedEx facility, hours before it was delivered by law enforcement to a common area outside the main entrance of Ms. Bucklin's apartment complex. Thus, the allegation by Defendant that he had a reasonable expectation of privacy in Ms. Bucklin's apartment because he allegedly resided there is somewhat of a red herring. To the extent Defendant claims any support for his Motion because the package was addressed to that apartment, the Court rejects Defendant's argument as the Court finds that he did not reside there at the time of the search and seizure of the package at issue and he had no reasonable expectation of privacy in that apartment. Defendant's testimony in this regard is not credible.

Third, the Court concludes that Defendant had no reasonable expectation of privacy in the package itself. As stated above, there is no established nexus between Defendant and the fictitious name listed as the recipient, and Defendant had no reasonable expectation of privacy in the delivery address listed on the package. In fact, Defendant even testified that he received the wrong package

and that his package was supposed to contain marijuana rather than fentanyl and crystal methamphetamine. There is simply no indicia of Defendant's ownership, possession, or control of the package which existed at the time of the search and seizure. In sum, there is no evidence that supports Defendant's subjective expectation of privacy in the package or an objective expectation of privacy that society is willing to recognize as legitimate.

Defendant appears to have lived a life of lies and deception while engaging in narcotics trafficking and he has done everything he can to avoid having any ownership interest in or connection to the package at issue and other illicit packages which have been shipped to him. In effect, for purposes of his drug trafficking business, he has disassociated himself in all possible ways from the illicit package at issue so he could disclaim ownership if the package was intercepted by law enforcement; however, for purposes of the suppression hearing, he has endeavored to testify in a manner that ties himself to the package so that he can contrive standing and attempt to establish a reasonable expectation of privacy in the package to permit him to challenge the search and seizure of the package. Although clever, this effort must ultimately fail.

The Court finds that Defendant has not established a subjective expectation of privacy in the package at issue. This Court further finds Defendant has not established that society is willing to recognize Defendant's asserted expectation of privacy as legitimate. Therefore, the Defendant lacks standing to challenge the search and seizure of the package at issue.

### B.  Whether FedEx's Search of the Target Package Implicates the Fourth Amendment

Although the Court's findings above as to Defendant's lack of standing to challenge the search and seizure of the package at issue is fatal to his Motion, the Court will nonetheless address,

for the purpose of making a full record, whether the search and seizure of the package in this case violated Defendant's Fourth Amendment rights. "A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." *U.S. v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003) (citing *U.S. v. Ford*, 765 F.2d 1088, 1090 (11th Cir.1985)). In order "for a private person to be considered an agent of the government, we look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Id.* (citing *U.S. v. Simpson*, 904 F.2d 607, 610 (11th Cir.1990) (internal citations omitted); *see also Jacobsen*, 466 U.S. at 115 ("The initial invasions of respondents' package were occasioned by private action. . . . Whether those invasions were accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character.")

Defense counsel argued at the conclusion of the suppression hearing that the evidence shows that Mr. DiMarco knew what the K9's reaction meant to Sergeant Combs and that the three affidavits submitted in this case, which were all created near the date of the incident, call this a seizure by Sergeant Combs. Defense counsel further argued that Mr. DiMarco circumvented the necessity of Sergeant Combs to seek out a search warrant. Defense counsel maintained that the tracking information, which falsely shows that the package was delivered at 10:29 a.m., is indicia of FedEx, at the very least, unintentionally helping law enforcement. Defense counsel further argued that law enforcement had no reasonable suspicion to even look at this package in the first place and that Mr. DiMarco would not have opened the package but for the K9 sniff and law enforcement involvement. Finally, defense counsel asserted that there was a concerted effort here

27

between FedEx and law enforcement, and that, if Sergeant Combs and the K9 had not been present, Mr. DiMarco would not have pulled out the package. According to defense counsel, it does not matter if law enforcement and FedEx had an actual preexisting agreement.

In response, the Government argued that the search was not conducted by a government actor as Mr. DiMarco is not part of law enforcement, had an untrained eye as to what was happening, thought he saw the K9 react to the package, and had the right to inspect the package. The Government next asserted that the testimony of Mr. DiMarco and Sergeant Combs shows that they have different interests. According to the Government, the testimony of Sergeant Combs and Mr. DiMarco was very clear and showed that Mr. DiMarco took the package from Sergeant Combs and opened it without assistance or encouragement. Moreover, law enforcement became aware of the search as it was happening. The Government pointed out that Mr. DiMarco and Sergeant Combs were the individuals who were present at the FedEx facility on July 28, 2020, and that the individuals who signed the affidavits were not present and had a less clear understanding of what happened. Finally, the Government maintained that the reasonable suspicion issue does not apply here because the search was conducted by a private actor and not a government actor.

The Court finds that the unimpeached evidence of Mr. DiMarco and of Sergeant Combs establishes that Mr. DiMarco lawfully opened the package as a private person employed by FedEx. There was no law enforcement encouragement of Mr. DiMarco to get him to open the package on behalf of law enforcement. This was not a ruse utilized by Sergeant Combs to avoid the warrant requirement. There was no implied or express agreement between Sergeant Combs and Mr. DiMarco. They each operated in their own orbit, and each acted independently of one another. Mr. DiMarco, as an agent of FedEx, took it upon himself to take the package from Sergeant Combs

and open the package after Mr. DiMarco independently observed the K9 show interest in the package. After opening the package on his own and observing the illegal contents, Mr. DiMarco then turned the package over to law enforcement (Sergeant Combs), and, at that point, law enforcement seized the package.

The testimony of Mr. DiMarco and Sergeant Combs was consistent; they both explained that Sergeant Combs' K9 alerted on the package, Mr. DiMarco saw the K9 come to a final response, Mr. DiMarco independently took the package from Sergeant Combs as he was standing near the belt, and Mr. DiMarco opened the package on his own without any aid or encouragement on the part of Sergeant Combs.

There is absolutely no evidence that Mr. DiMarco acted as an instrument or agent of the Government. While Defendant raises suspicions, he presented insufficient evidence to support his bare suspicions. Defendant contends that the discrepancy regarding the time that the FedEx package was delivered and the time that law enforcement actually delivered the FedEx package is indicia that Mr. DiMarco was working with law enforcement. However, the Court has determined that this is not actual evidence of some kind of agreement between FedEx and law enforcement, but rather seems to be an administrative entry or administrative error, as explained by Mr. DiMarco on cross-examination. There is zero support for Defendant's argument that this computer entry in FedEx's tracking system establishes collusion between law enforcement and FedEx.

Moreover, the language in the criminal complaint and in the search warrant applications does not constitute proof that Mr. DiMarco was made aware that Sergeant Combs was seizing the package <u>before</u> Mr. DiMarco opened it. At best, that language establishes that the affiants to those applications were imprecise and did not fully understand the nuances of how the package was

actually opened by Mr. DiMarco and thereafter seized by Sergeant Combs. While the Court expects better accuracy from the affiants to those applications and is disappointed in their imprecision, it does not constitute impeachment of either Sergeant Combs or Mr. DiMarco. The Court finds that Mr. DiMarco and Sergeant Combs, who were not the individuals who drafted the various affidavits, testified consistently and credibly at the suppression hearing. Their testimony when considered independently and together is very credible, and the Court credits their testimony.

Additionally, there is no evidence that the Government knew of and acquiesced in the intrusive conduct since the testimony was that Sergeant Combs did not realize Mr. DiMarco was going to open to the package until Mr. DiMarco stated that he had seen the K9 come to a final response, and, immediately thereafter, opened the package on his own as an agent of FedEx. There is also no evidence whatsoever that Mr. DiMarco's purpose was to assist law enforcement efforts rather than to further his own ends as an agent of FedEx. Mr. DiMarco testified that it is FedEx policy to prohibit the shipment of contraband, including narcotics, and that one of the reasons for the policy is to ensure the safety of FedEx couriers. The fact that Mr. DiMarco could not have known that the package contained narcotics if the K9 had not been present is simply irrelevant and does not in any way support Defendant's theory that Mr. DiMarco and Sergeant Combs had an agreement or were working in concert to avoid the necessity of law enforcement obtaining a search warrant for the package. The Court easily finds that Defendant's Fourth Amendment rights were not violated under these facts.

## V.     CONCLUSION AND RECOMMENDATION

In sum, the Court finds that Defendant did not have a reasonable expectation of privacy in the package and that he therefore lacks standing to contest the search and seizure. And, to the

extent it is relevant, Defendant did not have a reasonable expectation of privacy in Ms. Bucklin's apartment. Further, even if the Court assumed that Defendant does possess standing to challenge the search and seizure of the package (which he does not), the Court nonetheless finds that the package was opened by a FedEx employee, Mr. DiMarco, and did not involve government or law enforcement action. It was only after Mr. DiMarco lawfully and properly opened the package as a non-governmental actor that the narcotics were observed and seized by Sergeant Combs. There is simply no Fourth Amendment violation as claimed by Defendant.

Having carefully considered Defendant's Motion, the testimony at the suppression hearing, the demeanor and credibility of the witnesses, the admitted exhibits, and the parties' arguments in their various filings and at the suppression hearing, the Court concludes that Defendant is not entitled to suppression of the package at issue or the related evidence he seeks to suppress. Defendant's claims are all without merit and rejected. Accordingly, it is respectfully **RECOMMENDED** that the District Judge **DENY** Defendant's Motion to Suppress Evidence Derived from Law Enforcement's Illegal Search and Seizure [DE 73].

### **NOTICE OF RIGHT TO OBJECT**

In light of the upcoming jury trial scheduled for September 27, 2021, the Court finds it necessary and appropriate to shorten the time for any objections and response to seven (7) days pursuant to Southern District of Florida Magistrate Judge Rule 4(a). Accordingly, a party shall file written objections, if any, to this Report and Recommendation with United States District Judge Rodney Smith within seven (7) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(C) and S.D. Fla. Mag. Jdg. R. 4(a). Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an

issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

      **RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 25th day of August, 2021.


WILLIAM MATTHEWMAN
United States Magistrate Judge